## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Ronald D. Coleman (RC 3875)
GOETZ FITZPATRICK LLP
One Penn Plaza—Suite 4401
New York, NY 10119
212-695-8100
rcoleman@goetzfitz.com
*Attorneys for Defendant*
*Rabbi Shlomo Zalman Kaufman*

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

| | |
|---|---|
| KOLEL BETH YECHIEL MECHIL OF TARTIKOV, INC., *et al.*, | Docket No. 11-cv-7707 |
| *Plaintiffs*, | (VM-KNF) |
| - *vs.* - | |
| YLL IRREVOCABLE TRUST, *et al.*, | |
| *Defendants.* | |

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

| | |
|---|---|
| YLL IRREVOCABLE TRUST, *et al*., | 12-cv-3005 |
| *Plaintiffs*, | |
| - *vs.* - | **AFFIDAVIT OF DEFENDANT RABBI SHLOMO ZALMAN KAUFMAN** |
| RABBI SHLOMO ZALMAN KAUFMAN, *et al*., | |
| *Defendants*. | |

------------------------------------------------------------------------

| | |
|---|---|
| STATE OF NEW YORK | : |
| | : |
| COUNTY OF ROCKLAND | : |

Rabbi Shlomo Zalman Kaufman affirms, under penalty of perjury, as follows:

1.      I am a resident of Monsey (Rockland County), New York.  I am an orthodox

Jewish rabbi with special training and ordination as a rabbinical court judge, or *dayan*.  I have

served on various rabbinical courts and officiate at religious divorces in the New York area for nearly 30 years.

2.      By virtue of being named as a defendant in this litigation I have unfortunately been cast in the role of a litigant.  The Court will appreciate any neutral's reluctance to accept a disappointed party's "invitation" to "litigate" and thereby "prove" his lack of objectivity.

3.      Unfortunately, however, the serious and disturbing aspersions that have been cast on every single participant in the arbitration proceedings – parties, witnesses and arbitrators – besides those aligned with plaintiffs themselves are so serious, the false factual accusations are so scandalous and the mischaracterizations of the facts and circumstances are so material that I have no choice but to submit this Affidavit in order to correct the record.

4.      In light of the foregoing, I have in this submission made an effort to avoid "advocacy" – despite the fact that I am, in fact, a party to this lawsuit and could hardly be blamed for defending my actions, especially under these circumstances.

5.      Moreover, I am not an attorney, so the extent that it is accepted practice at all in this Court to make legal arguments in an affidavit, it would not be my place to do so.

6.      On the topic of Halacha – Jewish law – however, I am qualified to opine.  And because the motion papers before the Court improperly characterize many of my actions as contrary to Halacha, I have responded substantively here.   In that connection, I have taken what I understand is the unusual step, in an affidavit, of including footnotes that provide the authority on which I base my statements rather than including these in the main text, solely to enhance the "flow" of this testimony.

7.      From February 10, 2012 through April 4, 2012, a rabbinical arbitration panel comprised of Rabbi Alexander Grausz, Rabbi Moshe Bergman (the "Rabbinical Court") and myself conducted arbitration proceedings among Kolel Beth Yechiel Mechil of Tartikov, Inc.

("Kolel") (the original plaintiffs in the consolidated / related proceedings known to the Court as Docket No. 11-cv-7707 (VM-KNF)), YLL Irrevocable Trust ("YLL"), Meridian Trust Company, and Kochav S.A.R.L. ("YLL/Kochav") (the original defendants) (the "Arbitration").

8.      As the Court is aware, this dispute involves large and complex transactions involving portfolios of life insurance policies held pursuant to a form of investment known as viatical or life-settlement investments.   These involve the purchase of an existing life insurance policy from its owner, i.e., the covered person, for an immediate payment.   The investor then assumes the insurance premiums until the insured dies, at which time the investor collects the death benefit.   When a portfolio of appropriately diversified policies is properly managed, life settlement investments and viatical investments can be highly attractive, because they are relatively low risk and are not directly affected by the stock market, bond market or price of commodities.

9.      The dispute here concerns the purchase and sale of several such portfolios and accusations that one or the other party failed properly to manage them, including by making timely premium payments, causing one or the other side's reasonable investment expectations to be profoundly frustrated.   The issues before the Rabbinical Court then, included both the historical facts involving such management, the facts and circumstances surrounding the transactions themselves, and, critically, the ongoing maintenance of these portfolios' value including the securing of timely payments of premiums in order to preserve these assets during the pendency of the Arbitration.

10.      The Arbitration took place under an Arbitration Agreement effectuated February 10, 2012 and various related agreements and, as the Court is aware, partially under the Court's auspices.

11.     Under the Arbitration Agreement, the parties authorized the arbitrators to "make their award based upon Din Torah [i.e., Halachic adjudication], compromise, settlement, or any other way they wish to reach a decision."   In essence, this placed full discretion in crafting relief to the parties, both procedurally and substantively, in the Rabbinical Court, limited only by the outer bounds set by the law of the State of New York respecting the validity of arbitral proceedings and awards.

12.     As mentioned above, the Rabbinical Court was comprised of three rabbinical judges.   Each side designated its "own" arbitrator selected me as the third or "neutral" arbitrator pursuant to the Halachic principle known as *zeh borer lo echad* (loosely translated as "each party chooses one").   This is parallel to the procedure in contemporary secular arbitration by three panelists.

13.     I was personally present at all the sessions of the Arbitration.   Besides the Rabbinical Court and counsel for the respective sides, also in attendance were Rabbi Gershon Spiegel, Rabbinic advocate (To'en) for YLL/Kochav; Rabbi Naftali Meir Babad, Rabbinic advocate (To'en) for Kolel.

14.     One session, which took place on February 10, 2012, proceeded without secular counsel for YLL/Kochav – who had a scheduling conflict – by agreement of all the parties and their counsel.

15.     At this hearing, YLL/Kochav was represented by its To'en, Rabbi Gershon Spiegel, who besides acting as rabbinical advocate held a power of attorney on behalf of his client.

16.     There is no basis for the assertion that the hearing on this date was merely procedural in nature, not an actual arbitration hearing or that the statements, representations and positions espoused by any participant are not binding, as explained below.

17.     For one, as a practical matter the February 10th hearing was not conducted as if it were under any such limitation.  The rabbinical advocates, Rabbis Spiegel and Babad argued, presented evidence and make certain demands on behalf of their respective clients.  They also requested that the Rabbinical Court rule immediately on various issues

18.     Such a proceeding would not have been consonant with Halacha.[1]  Nor would there have been any need for YLL/Kochav to give Rabbi Spiegel power of attorney prior to the hearing – which the parties and the Rabbinical Court were particular to ensure was done – if Rabbi Spiegel had no power to bind his principal, or for that matter to advocate on his client's behalf, as he in fact did.

19.     At that February 10th hearing, a contentious issue arose from the refusal of YLL/Kochav to respond to the Rabbinical Court's request that it identify its principals, i.e., the person or persons who really owned or controlled YLL/Kochav.

20.     Halacha provides that such information is, in modern judicial parlance, clearly "discoverable," and that in fact the principals themselves must appear and testify, if a rabbinical court determines that their testimony could elucidate relevant facts and circumstances concerning the claims and defenses.[2]

21.     This Halachic requirement is even more stringent in a situation where, as here, a party is represented before the rabbinical court by a representative, such as by a power of attorney, authorizing that designee to both represent and bind it in the proceedings.  In such a case the Halacha clearly mandates that the individual in question appear before the panel if so instructed.[3]

22.     The YLL/Kochav side, however, refused even to identify its ownership.

23.     This refusal would normally be breach of the Arbitration Agreement.

---

[1] Once the parties start presenting their arguments the Din Torah has already commenced. Choshen Mishpot 5:5; Sema 15).
[2] Responsa H'Rambam 4:11.
[3] Shulchan Oruch Choshen Mishpot 124:1;, Shach 1; 2 Responsa Rashbah 396; Ritvah (Shavous 30B); Aruch HaShulchan 124:2; Urim V'Tumim 124:1.

24.     Nonetheless, without waiving its right to demand the information sought, the Rabbinical Court with permission from Kolel did go forward with the hearing on February 10, 2012, and issued certain rulings at the request of the parties.

25.     One of these requests concerned authorization to reinstate policies that had lapsed during the course of the proceedings, which potentially could salvage significant value in the portfolios.

26.     The testimony at the hearing showed that YLL/Kochav had, when notified of these lapses, refused either to make payments in an attempt to reinstate these policies or to share in the expense of hiring counsel as may have been needed to secure these reinstatements.

27.     YLL/Kochav's To'en, Rabbi Spiegel, acknowledged discussing this issue with YLL/Kochav's counsel and confirmed that YLL/Kochav would not cooperate or contribute.

28.     Thus Kolel requested that the policies be reinstated by making payments out of an escrow established at the outset of the Arbitration to pay back premiums, where possible.

29.     After due deliberation, the Rabbinical Court made and promulgated the following on February 10, 2012.

    a.  All insurance premium bills, cancellations, lapses and reinstatement notices, formerly transmitted only to me as escrow agent by agreement of the parties, would be sent to both parties.

    b.  Counsel for Kolel was granted permission to reinstate policies that had lapsed during the course of the proceedings.

    c.  I agreed to Rabbi Spiegel's request that the Rabbinical Court not examine any of the pertinent documents, including the central Purchase/Sale contract, until such documents were formally entered into evidence by counsel at a hearing.

30.     The Rabbinical Court ultimately held eight arbitration sessions, which took place on February 10th, March 7th, March 9th, March 23rd, March 26th, March 30th, April 3rd and April 4th of 2012.

31.     After concluding the above hearings, the Rabbinical Court evaluated the claims, counterclaims and defenses; weighed the evidence given in both testimonial and documentary form; examined the submissions, arguments and admissions; and based on consideration as well of the conduct of the proceedings as a whole, ruled that the 43 policies held by Wilmington Savings Fund Society (WSFS) on my behalf as escrow agent be transferred immediately to Kolel.

32.     The Rabbinical Court also directed that additional sessions be scheduled and that they will be devoted to handling the respective parties' claims relating to damages, legal expenses and other issues pertaining to the case and within the broad scope of matters subject to adjudication by us under the Arbitration Agreement.

33.     Having set out the basic facts concerning the Arbitration, it falls to me now to address the various claims made in the papers filed in support of the pending motion concerning me, my conduct, alleged conduct and imputed actions during the course of those proceedings.

34.     At the outset it should be noted that at no time prior to or during the completion of the arbitration process did any participant – including parties, representatives and counsel – raise any issue that could have implicated the claims of bias, much less "corruption," now being made connection with my actions.

35.     Unfortunately, it is evidently becoming common practice for parties to rabbinical arbitration, disappointed in the outcome of a proceeding, to run to a presumptively friendly court and claim to have belatedly "discovered" supposedly nefarious and secret relationships and links between the rabbinical judge who has not seen the case their way.   That is what has happened

here, with plaintiffs claiming that I am "tainted" through "various connections and interactions with an intermediary connected with Kolel."

36.     There is no "taint."  The mere fact that plaintiffs are able, by churning enough names and relationships, to suddenly adduce an attenuated "link" between their adversaries and me only demonstrates the mundane facts that the participants in this dispute are members of a relatively limited social and geographical circle, and that as a clergyman many people pass through my offices for a wide variety of reasons.  As demonstrated below, nothing in plaintiffs' papers amounts to even a plausible case for the imputation of bias on my part.

37.     As a rabbi, of course, I interact with many hundreds of people over the course of a year – answering their Halachic (religious) inquiries, give counseling and guidance and contributing what I can to the resolution of communal concerns.

38.     In particular, the supposed "intermediary connected with Kolel" referred to in plaintiffs' papers is Mr. Zishe Gelb, a young man with whom I do not have a personal relationship who has from time to time referred couples seeking counseling or religious guidance to me.

39.     If Mr. Gelb has some connection or affiliation with Kolel, I am not aware of it.   He has certainly never discussed it with me.   I am not aware of any other person or medium who could claim ever to have made me aware of such a connection.

40.     Most importantly, however, I have never discussed Kolel, its principals or representatives, YLL/Kochav, or any aspect whatsoever of the Arbitration, with Mr. Gelb.

41.     Another accusation made by plaintiffs is that I "impermissibly 'froze out' one panel member from discussions leading to a defective and procedurally improper decision, intentionally and purposely preventing one arbitration panel member from presenting a position adverse to the pre-ordained decision the supposed 'neutral' Rabbi was commissioned to reach without bias or

prejudice or misconduct."   This is false. I did not "freeze out" any Panel member from discussions and my decision was not pre-ordained in my mind.

42.     In fact, I did interact with the rabbinical arbitrator selected by YLL/Kochav, Rabbi Moshe Bergman. He was free to and did express his opinion that the policies belonged to the YLL/Kochav side.   This matter was debated among Rabbi Alexander Grausz, the Kolel-selected rabbinical arbitrator, Rabbi Bergman and myself.

43.     I respectfully submit that the absence of testimony by affidavit from Rabbi Bergman himself to support this accusation is telling.

44.     Ultimately the ruling of the Rabbinical Court was based on a vote of the majority of the arbitrators, with Rabbi Bergman voting the other way.   I regret that we could not bring Rabbi Bergman around to our way of thinking.   His failure to convince me or Rabbi Grausz of his view, however, is not a "freeze-out"; rather, it constitutes the operation of a three-judge arbitration panel in precisely the manner in which it was intended.

45.     Paragraph four of the Stern Affirmation states, "It appears Rabbi Kaufman is not 'neutral' and, in fact, we are informed told an intermediary he would issue a favorable decision to Kolel approximately ten days before any supposed interim decision was rendered . . ."

46.     Mr. Stern is referring to the Affirmation of David Paneth dated April 12, 2012, which states, at paragraph 5, the following:

> On or about March 30th 2012, I was in the office of Rabbi Kaufman, when Zishe Gelb arrived asking to speak with Rabbi Kaufman. Both Rabbi Kaufman and Gelb proceeded to the coffee room adjacent to his office. After which time I overheard Gelb and Kaufman conversing about a case that I was entirely unfamiliar with relating to a litigant party named Babad. First Gelb was heard insisting that Babad wants his decision Sunday and cannot wait longer. The response was clearly heard by me from Kaufman. "Tell Babad that he has to give me another week and he will receive a 'Psak' (ruling or decision) in his favor. It can't happen sooner than before a week into [the intermediate days of the coming Passover holiday].

47.     This account is a pure fabrication.

48.     David Paneth could not have met with me on March 30, 2012 because on that day, a Friday, I was in Brooklyn – not Monsey, in Rockland County – as part of the Rabbinical Court, conducting a hearing in this very case.   I left my home without going to my office in order to get to Brooklyn on time for the hearing and did not arrive home until late in the afternoon, right before the Sabbath, which began at nightfall and, of course, continued through the next evening.

49.     In fact, the discussion between me and Mr. Gelb that Mr. Paneth testifies, on pain of perjury, to having overheard never occurred.   As I stated above, Mr. Gelb and I have never discussed any aspect of the Arbitration.

50.     It is well known to the Court that no lie is as effective as one that mixes in some truth:   there was, in fact, one occasion when David Paneth and Mr. Gelb were in my office at the same time.   My recollection is clear, because of the business involved, that this took place on March 2, 2012, however, not the 30th.   In fact, there were three other people present.   Mr. Paneth was in the midst of a dispute with another man, and they came before me for mediation, along with one witness.   Another rabbi, an expert on the Halacha concerning resolution of monetary disputes, was also present.

51.     While the two rabbis were conducting the mediation, sitting at the head of the large table in my office, Mr. Gelb came in to ask me an unrelated Halachic.   With the permission of the others we briefly adjourned and I went with Mr. Gelb into the adjacent room, closed the door and discussed his question – having nothing to do with Kolel or the Babads – privately.

52.     Incidentally, it cannot be claimed that Mr. Paneth merely made an error as to the date in his affidavit, because it is patently impossible for me to have made the comment he claims to have heard on March 2d:   "Give me another week" is incompatible with supposed "target" date of the middle of Passover, Passover being over five weeks in the future, as would have been understood by all participants in the conversation.

53.     On Monday, April 16, 2012, Mr. Paneth came to my office and claimed to be seeking forgiveness for his perjurious testimony. He admitted that he never overheard any discussion between Mr. Zishe Gelb and myself.

54.     I immediately called Mr. Coleman, my counsel in this matter and handed the receiver over to Mr. Paneth who reiterated his regret, and offered to testify that he had since "forgotten" the facts in his Affirmation if called to testify about them in person. Mr. Paneth told me, after he got off the phone, that Mr. Coleman advised him such testimony, which would be false, was not acceptable, but that rather that the only way to "undo" his previous false testimony would be to provide a new, accurate affirmation.   Subsequently, I received a copy of a notarized corrected affirmation dated April 16, 2002, in which Mr. Paneth retracts his earlier statement and claims to express genuine regret.

55.     The next day, however – April 17, 2012 – Mr. Paneth signed yet another affirmation claiming to have been was forced to make his retraction of his first affirmation. Unable to claim that either my lawyer or I suborned his perjury, he claims, fantastically, to have been approached by two unknown individuals, one of whom was pointing to a weapon on his waist, continuing, "I was then instructed to settle with Rabbi Shlomo Zalman Kaufman while threatening to kill me if I will not obey.   I shortly thereafter contacted Rabbi Kaufman while being under the impression that this had to do with a custody dispute in the community that I was involved with Rabbi Kaufman."

56.     The preposterous nature of this claim – including the ridiculous assertion that I would have some reason to be "working with" Mr. Paneth in an unidentified capacity on a custody situation – hardly requires further comment.   It is a complete invention.

57.     In fact, the full extent of my relationship with Mr. Paneth is as follows:   I officiated at his second divorce; I helped him settle a dispute with a former partner; he asked me to help him

find a third wife; and, later, in connection with his dissatisfaction over circumstances arising from another matter, barged into my office, turned over the tables, threw sacred Jewish texts on the floor and threatened me. Others who were present in the building heard the commotion, came upstairs and escorted him outside.

58.     Moving from the ridiculous to, at least an aspect of the plaintiffs' submissions that actually relates to the dispute here, the Stern Affirmation refers, in paragraph 12, to the "emergency nature of the matter, namely the complete loss of assets of over $300 million in face value of policies, which was absolutely and unconditionally sold . . . "   In fact, the current value of the policies is only a fraction of $300 million, which is their face value and ignores the considerable cost – approximately $22 million per year – of premiums to maintain this portfolio. Thus its true market value is more realistically estimated at $40-45 million.

59.     Mr. Stern also states, at paragraph 5, that "[n]o relief is sought against the latter two (Rabbi Grausz and Rabbi Bergman), as they are named in the complaint solely as they appear to be necessary parties, inasmuch as they are non-neutral members of the Rabbinical Panel."   This requires some comment in terms of Jewish law.

60.     Although, as discussed above, each party in a three-judge arbitration may select a rabbinical judge, these judges are not merely paid votes. They are halachically and legally bound to decide the case with an open mind, based on the actual testimony, evidence and documents presented and the application of the appropriate legal doctrines to the facts.   It is regrettable that evidently YLL/Kolel viewed their selected rabbinical arbitrator, Rabbi Bergman, as a "shill" on the rabbinical panel.   I can hardly imagine that Rabbi Bergman viewed himself in such a reprehensible light, notwithstanding, as I mentioned earlier, that Rabbi Grausz – who also weighed the facts and the Halacha objectively – that we were unable to convince him of the merits of our views.

12

61.     Turning to the Affidavit of Douglas Stein, Esq. dated April 12, 2012.   Mr. Stein is not a disinterested witness. Based on the documents adduced at the Arbitration, he and his law firm represented Kolel in the underlying transaction and even assisted in the syndication, i.e., shared funding, of the purchase of the policies.

62.     Mr. Stein's actions and ethical conduct have been seriously questioned by Kolel, whose new counsel filed a complaint against Mr. Stein alleging that he had misappropriated $400,000 of Kolel funds in his firm's escrow account.   I have no basis on which to believe these accusations or otherwise, but the fact that this accusation was made by an attorney, and Mr. Stein's conduct before the Rabbinical Court, suggests the light in which his attitude toward Kolel and his objectivity should be viewed.

63.     Paragraph 5 of the Stein Affidavit states as follows:

On April 4, 2012, I appeared at the Arbitration to testify. I also understood that Kolel's counsel listed me as a witness with relevant knowledge about the facts of the case, and asked YLL's counsel to produce me at the arbitration to testify. Accordingly, in the afternoon of April 4, I began to present testimony before the panel. There were many interruptions, and I believe I testified for less than two hours. I certainly had only begun testifying, providing only background information about me and the life settlement industry when Rabbi Kaufman declared that the panel had to meet to discuss certain matters.

64.     Mr. Stein, contrary to the suggestion in his affidavit, was invited to appear at the Rabbinical Court by YLL/Kochav, not Kolel.   He was not forced to appear.   YLL/Kochav scheduled Mr. Stein's testimony toward the latter part of the day and he ultimately more or less fled the hearing, supposedly because he had to catch a plane to Atlanta.

65.     Mr. Stein is being truthful when he states that he "testified for less than two hours." He is being truthful, but misleading, however.   His testimony lasted less than 25 minutes.   Mr. Stein's testimony could, and should, have been longer, however.   This is because he declined to bring any of his files, documents, correspondence, notes or e-mails to the Rabbinical Court, which he had been instructed to do.   He also refused to answer any specific questions regarding the

Sell/Purchase Agreement that governed the transactions at issue or what his involvement in the deal was.   This refusal to testify about key aspects of the dispute, many of which he was in the best position to recount, substantially undermined his value as a witness.

66.    Ultimately, in fact, Mr. Stein stated that he would not answer any questions as long as counsel for Kolel's lawyer or Mr. Chaim Shia Babad, a party, remained in the room; any questions posed by Kolel's lawyer; and, when told – considering that Mr. Stein is a lawyer, we could hardly believe he had to be told this – that this was not an option, he nonetheless refused to continue unless Kolel's attorney would sign a confidentiality statement providing nothing Mr. Stein would say at the Arbitration hearing would go beyond the Rabbinical Court or be used in any other proceeding.

67.    It should be noted that all this took place only after Mr. Stein had demanded agreement by Kolel's counsel that as a pre-condition to testifying a letter be transmitted to the Ethics Counsel of the First Department not only retracting the complaint against him by Kolel but stating that it was had been meritless in the first place.   A letter stating only that the complaint was withdrawn was in fact sent.   Mr. Stein, however, claimed not to believe that the letter had been sent, and refused to confirm this with his former employer – which was an interested party and had been copied on the letter – to confirm its transmission, as suggested by counsel for Kolel.

68.    Mr. Stein's testimony before the Rabbinical Court was given minimal credibility, and it was entitled to no more.   According to Torah Law, one who stands to gain or lose by defending a particular position whether it be financially or even his reputation, is disqualified to testify in a manner that will justify his own actions.[4]   His testimony is only accepted if it is contrary to his interests.[5]   However, it is my practice, and within the discretion of the Rabbinical Court both under Halacha and under the Arbitration Agreement, to permit and even encourage any and all to

---

[4] Choshen Mishpot 37:1, Aruch HaShulchan, *loc cit*.
[5] Sema 1.

come forward because it may help to lead to the truth.   Still, the credibility of such a witness is entitled to little weight when, as here, it is self-serving and and the witness is obstreperous uncooperative.[6]

69.     Regarding the affidavit of Rabbi Uziel Frankel dated April 12, 2012, in which he offers his opinion of the subject arbitration agreement as it relates to the conduct of a rabbinical court, as well as the decision dated April 10th 2012 that is titled "First Preliminary Decision, Ruling and Award of the Rabbinical Court," it must be said that, unfortunately, it is seriously flawed.

70.     It should be said at the outset that Rabbi Uziel Frankel's reference to Sharia law is misplaced, to put it mildly, and has no bearing whatsoever on this matter.

71.     Rabbi Frankel states, "It is most definitely clear from the language and clauses used in the document (arbitration agreement) that it is not an agreement to comply with a Rabbinical court or Beth Din, and should not be extended any privileges or leeway occasionally provided to a religious court."   But paragraph 7 of the arbitration agreement states explicitly that the parties authorized the arbitrators to "make their award based upon Din Torah, compromise, settlement, or any other way they wish to reach a decision."   This language can only be considered an expansion, not a limitation, of any conceivable "privileges or leeway occasionally provided to a religious court" – not that any such leeway was needed here.

72.     Rabbi Frankel states, "Under Halachic law a party may demand of Rabbinical judge, the Halachic source of his ruling." This is incorrect as a matter of "black letter" Halacha as applied to an arbitration panel such as the one in this case.[7] Moreover, paragraph 12 of the Arbitration Agreement states: "The members of the AP [Arbitration Panel] need not disclose to the

---

[6] Choshen Mishpot 37:23; Aruch HaShulchan 37:3-22.
[7] Ramo Choshen Mishpot 14:4; Urim 21.

Parties or to anyone else the halachic, legal, factual or other basis for their award, and the Parties hereby waive any right to seek, demand or compel disclosure thereof as they otherwise may have."

73.     Secondly, the parties are well aware of the basis of the Rabbinical Court's ruling. It was discussed among Rabbi Grausz, Rabbi Bergman and myself.   In sum, YLL/Kochav failed to show that a valid Purchase/Sale was effectuated under applicable law, and YLL/Kochav had no legal ground to refusal to return the policies to Kolel.

74.     Rabbi Frankel goes on to state, "Moreover, article [i.e., paragraph] 15 [of the Agreement] bars the parties from proceeding to a Beth Din [Rabbinical Court]" But paragraph 15 says no such thing.   The entire subject of the Agreement, of course, was just such a proceeding. Paragraph 15 prohibits any appeal or attempt to secure judicial review of the Rabbinical Court's ruling – which, of course, is exactly what this lawsuit brought by YLL/Kochav is.   As to Halacha, observant Jews, in fact, must go before a rabbinical court for adjudication of disputes such as these.[8]   They would not be free even to contract out of such an obligation, which is imposed by religious, not private law.   In any event, the suggestion of Rabbi Frankel that this clause of the Arbitration Agreement providing for rabbinical arbitration actually forbids rabbinical arbitration cannot be entertained seriously.

75.     Rabbi Frankel also states, "Under Halachic Law a Rabbinical Court does not convene the month of Passover which begins two weeks prior to Passover and certainly not during the Passover holiday."   There is no such "law."[9] At best Rabbi Frankel may have in mind the custom not to summon a party to a religious court during that time, but even this is a custom only where the parties do not live in the same city as where the litigation takes place.[10] In this situation,

---

[8]  Choshen Mishpot, 26:1,4; Tashbatz, Or Zeruah (3:1); Sema.
[9]  *See*, Code of Jewish Law 5; Sema 6.
[10]  Tur, Choshen Mishpot 5, quoting Rama, Code of Law, 5:2.

the parties all live locally.   Moreover, if any such hearings have begun prior to the month in which Passover occurs, they may continue even during the Jewish month that Passover falls.[11]

76.     Above all, even where there is a limitation, where, as here, the parties willingly agree to participate, it is permissible even initially to commence a rabbinical arbitration during the month of Passover.[12]   In this instance the parties willingly agreed to hold the arbitration hearing during this month.   In fact, if – as also obtained here – time is of essence and one of the parties stands to incur losses or damages, then even initially the rabbinical court may order the parties to appear during this month [13] and even during Chol HaMoed (the intermediary days of the holiday)[14].

77.     In this case, Kolel was paying millions of dollars in premiums per month and incurring unnecessary high expenses in order to keep policies claimed to be owned by YLL/Kochav viable. Not proceeding with the arbitration during this time would have caused substantial, and likely irreplaceable, losses to Kolel. Under the circumstances, it was not only permissible but obligatory to convene a rabbinical court.

78.     Unfortunately, despite the urgency the Arbitration was complicated because the YLL/Kochav team had difficulty in scheduling hearings. For example, one team member had planned a trip to Europe, another to Israel and Canada; another had to prepare for a large case in civil court. One would not sit Sundays or evenings. Another had a tight schedule or speaking engagements and other arbitration cases.

79.     Rabbi Frankel continues, stating that paragraph 23 of the Arbitration Agreement "refers specifically to the manner in which the parties are binding themselves with total awareness under the doctrines of Rabbinical Court Choshuv; Ofen HaMoel, Lo K'asmachta etc. – this article

---

[11] Ramo 5:2; Piskei Ma'Haryoh 400; Pischai T'shuvah, Choshen Mishpot 5, *quoting* Responsa Shvus Yaacov.
[12] Choshen Mishpot 5, Sema 6.
[13] Sema, *id*.; Orach Chaim (Chapter 545)
[14] Bach 331, *quoting* Mordechai and Sha'rei Teshuvah; Marik (*shoresh* 14).

only further assures that no party will afterwards seek redress elsewhere." In fact, this language is a common formulation used to effectuate the arbitration agreement but says nothing about seeking redress elsewhere.

80. To further quote Rabbi Frankel: "The law recognizes the practical reality that in a standard tripartite arbitration each party's arbitrator is not individually expected to be neutral." This statement is not only halachically inaccurate, it is repugnant conceptually. A rabbinical arbitrator is prohibited from showing a preference to the side that selects him, and one who does so is described as "perverting the rod (Septa) of justice."[15] Another leading authority is even more emphatic, ruling that the rabbinical judge selected by one side is obligated to advocate the position adverse to the party that chose him.[16]

81. After making baseless claims against my personal conduct – largely on the "authority" of the discredit Paneth Affirmation – Rabbi Frankel faults Rabbi Grausz and me for issuing the First Preliminary Decision after Rabbi Bergman travelled to Canada for the Passover holiday (during the intermediate days of Passover), relying on Paragraph 4 of the Arbitration Agreement which guarantees that disputed matters be heard and determined by the three arbitrators and not two arbitrators.

82. But the arbitration was heard and determined by the three arbitrators. The First Preliminary Decision issued after the close of all evidence on which it was based. Two of the three arbitrators then agreed on a ruling, after considerable deliberation that had in fact included Rabbi Bergman, who was informed of the decision by Rabbi Grausz and myself; there is no need for this to be done in the presence of the parties,[17] though they were present at the ruling. In turn, Rabbi Bergman informed me on April 12th that he would not sign the ruling and was hesitant to

---

[15] Rosh (Tractate Sanhedrin 3:40); Responsa Ranach 4.
[16] Terumas Ha'Deshen 344.
[17] Responsa HaRashbah 1,118, *quoted in* Choshen Mishpot 18:6), Responsa Ma'Haram M'Rottenburg 4:526; Shach 13:8), Sema 18.

continue the arbitration any further.   When the rabbinical arbitrator selected by each side tells the side that selected what the decision is, that is sufficient to be considered a perfected and final ruling.[18]   Obviously there is no need for a unanimous ruling;[19] when two of the three judges agree, the decision has the status of a ruling by all three[20]  and must be so regarded even by the lone arbitrator who voted the other way.[21]  Nor does the decision require all three signatures to be valid; only two are necessary.[22]

83.   Rabbi Frankel claims that a rabbinical court cannot issue a temporary ruling.   But the First Preliminary Decision was not "temporary."   In fact, a rabbinical court may issue an interim ruling.[23]   Furthermore, the Arbitration Agreement specifically states at paragraph 13 as follows: "The Parties shall abide by and perform any interim or final award rendered by the members of the A.P. (Arbitration Panel), which shall be enforceable, in any court of competent jurisdiction . . ."

84.   Continuing his shotgun approach to second-guessing the Rabbinical Court, Rabbi Frankel writes, "Arbitrators . . . may act only upon proof produced at a hearing . . . [and] may not predicate their award on the strength of independent investigation unless so authorized by the parties."  But Rabbi Frankel does not identify the "independent investigation" he is referring to. There was none.   There is certainly no obligation for a rabbinical court to delay; when the Halacha and the outcome are clear, a ruling should be issued immediately, especially if delay would be harmful to the interests of the prevailing party.[24]

85.   As I stated earlier, I am not an attorney and this is not a memorandum of law.   But I can and must address certain factual assertions in plaintiffs' moving brief, one of which refers to

---

[18]  Responsa MaHarsham 3:67.
[19]  Choshen Mishpot 18:1.
[20]  Nesivos 25:18; Judicial Procedure 8:27.
[21]  Meharam Choviv, *quoted in* Get Pashut Klal 1.
[22]  Radvaz, *quoted in* Ketzos Ha'Choshen 19; Ma'Bit.
[23]  Judicial Process 8:79.
[24]  Responsa HaRama Mi'Pano 86; Responsa Ma'Hari Weil 149); Responsa Mahari Bruna 335; 6 MaHarsham 121.

an alleged "false urgency manufactured and created" by me and a "misplaced rush to judgment." The Court should be aware of the following facts.

86.     After the witness, attorney Stein, left the premises at the April 4th hearing, I asked the other two rabbinical arbitrators to join me into the adjoining room. I then proposed alternate procedural structures for moving forward. After placing these before the rabbinical arbitrators, we returned to the main chamber and explained them to the parties.

87.     It is important to preface this recitation of my proposals by reiterating the difficulty we had experienced in persuading the YLL/Kochav team, to put all other business aside in order to afford the Rabbinical Court the opportunity to devote a three or more days per week to the arbitration to avoid the lapse of the policies.   Ultimately YLL/Kochav acted at every juncture to delay, not to press for resolution – almost as if its strategy were to await the death of one the very elderly insured parties and the resulting policy claim as a source for additional funding.

88.     Thus the first option was to offer YLL/Kochav another 60 days to complete their submissions and testimony, on condition that they deposit two months' worth of insurance premiums into escrow.   Besides being sensible – if, as they claimed, they owned the policies, it behooved them to provide funds to guard against a lapse – the requirement of such a deposit is authorized by Halacha.[25]  Moreover, I suggested that if these 60 days were not sufficient, Kolel would be responsible for making an advance payment to cover premiums for another 60 days.

89.     Alternatively I urged the parties to negotiate a way to deliver the policies to Kolel, which in turn would enable Kolel to obtain further financing while providing a compromise-based recovery of some value to YLL/Kochav.

90.     The third choice, in my view, was that the parties could authorize an immediate ruling as to who owns the policies based on all documents, testimony and evidence provided to the

---

[25] Choshen Mishpot 16:4.

Rabbinical court until now and waive any right to further hearings, following which the arbitration could continue to a second phase of the arbitration addressing damages, legal fees and other matters.

91.     Rabbis Bergman and Spiegel and counsel for YLL/Kochav then left the room and spoke amongst themselves and then returned.

92.     Rabbi Spiegel then spoke, requesting that Rabbinical Court immediately decide that YLL/Kochav owned the Policies. Counsel for Kolel responded that Kolel wants the panel immediately decide that Kolel owns the Policies, and asked counsel for YLL/Kochav if he also agreed that the panel decide this issue. He nodded his head in agreement.  Counsel for Kolel then asked YLL/Kochav's lawyer if he agreed that the Panel could decide the issue of who owns the Policies; he again shook his head up and down emphatically. It was abundantly clear that he agreed, and counsel for Kolel then said: "Let the record show that the parties want the Rabbinical Court to rule now on who owns the Policies."

93.     In fact, the Rabbinical Court had concluded that it was sufficiently prepared and knowledgeable to make this decision.   We left the main room to deliberate.

94.     I told the rabbinical arbitrators that I would prefer a consent agreement to a ruling. According to Jewish Law, when faced with final judgment, a rabbinical court may suggest that one side placate the losing side and amicably.[26] I explicitly told Rabbi M. Bergman my conclusion that, under Halacha, the policies belong to Kolel, and Rabbi Grausz agreed.  I continued that it would be preferable to seek a settlement nonetheless, in accordance with leading scholars who suggest this approach.[27] My requesting the parties to settle was a suggestion, not a ruling, and had no effect in Halacha on the ruling itself.

95.     Rabbi M. Bergman left the room to confer with the YLL/Kochav group. Meanwhile I approached counsel for Kolel and offered to help with the negotiations upon

---

[26] Shach 12:6.
[27] Responsa Zekan Aaron 2:126; Sefer Mishpatei Tzedek 12; Biur HaMishpot (Rabbi Chaim Kanievsky).

provision of a written waiver.  On April 6, 2012 a Monsey rabbi, Rabbi Chaim Leibush Rottenberg, called with an offer.  I called Rabbi Bergman and asked that he speak directly to Rabbi Grausz without my involvement, unless the attorneys sign waivers.

96.     Rabbi Bergman then expressed his view that the Rabbinical Court could not require YLL/Kochav to escrow the next two months' premium as a condition of giving YLL/Kochav two more months to arbitrate.  I responded by explaining the Halachic basis for this option.[28]  Rabbi Bergman responded that YLL/Kochav did not have $2.4 million to pay these premiums.

97.     One refrain in the motion by YLL/Kochav is that the policies were "absolutely and unconditionally transferred, assigned and converted to YLL/Kochav even if the premium for the policies were not paid."   But notwithstanding the recitation in the documents, the transaction could only be effectuated as an initial matter if, in fact, all the conditions of the transfer of ownership – subsequent premium payments aside – were met.  The Rabbinical Court concluded that they were, in fact, not met, and that the "absolute" and "unconditional" language could not be any better than the question of whether the transfer of ownership itself was effected.  We concluded that it was not.

98.     I make this statement by affirmation instead of as an affidavit under oath because I am an orthodox Jew who is prohibited by religious law from making an oath.


_____
RABBI SHLOMO ZALMAN KAUFMAN

Signed and affirmed before me this ___4th___ day of May,
2012 in Monsey, New York

Notary Public _____

SHIA T. GRUNBAUM
Notary Public - State of New York
# 01GR5030044
Qualified in Rockland County
Commission Expires 7/5/14

_____
[28] Aruch HaShulchan (Choshen Mishpot 73:15, 4:5; Elef Le'choh Shlomo 1; Chochmas Shlomo, Kesef HaKedoshim 75; Maril Diskin 2; Responsa Divrai Malkiel 3:170); Responsa Chelkas Yaakov 2:106; Responsa of the Tzemach Tzedek 1; U'lam Hamishpot 75.