UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

KOLEL BETH YECHIEL MECHIL OF                          11 CV 7707 (VM)(KNF)
TARTIKOV, INC.,

                              Plaintiff,

        -against-

YLL IRREVOCABLE TRUST, MERIDIAN
TRUST COMPANY, as Trustee of YLL Irrevocable          **DECLARATION IN**
Trust, KOCHAV S.A.R.L. and WILMINGTON                 **SUPPORT OF MOTION**
SAVINGS FUND SOCIETY, FSB,                            **FOR REARGUMENT/**
                              Defendants.             **RECONSIDERATION**

-------------------------------------------------------------------------X

YLL IRREVOCABLE TRUST and
KOCHAV S.AR.L.,

                              Plaintiffs,

        -against-

RABBI SHLOMO ZALMAN KAUFMAN,
RABBI ALEXANDER GRAUSZ,
RABBI MOISHE BERGMAN,
KOLEL BETH YECHIEL MECHIL OF
TARTIKOV, INC., and
WILMINGTON SAVINGS FUND
SOCIETY, FSB,

                              Defendants.

-------------------------------------------------------------------------X

        **STEPHEN R. STERN** hereby declares under penalty of perjury, pursuant to 28 U.S.C. §

1746, as follows:

        1.  I am an attorney duly admitted to practice law before the Court of the State of New York

and the United States District Court in and for the Southern District of the State of New York.

        2.  I am a member of the law firm of Hoffinger Stern & Ross, LLP, counsel for the plaintiffs

YLL Irrevocable Trust and Kochav S.A.R.L. [together "Pltfs"], whose action under 12 CV 3005

was consolidated with the action commenced by (defendant) Kolel Beth Yechiel Mechil of Tartikov, Inc. ("Kolel") under the above docket number.[1]

3. This Declaration is submitted in support of Pltfs' Motion to Reargue and for Reconsideration of the Court's Decision and Order dated July 11, 2012 (the "Decision"), based largely upon newly discovered evidence including extremely scandalous information provided by non-interested third parties which paints Rabbi Kaufman, the purported "neutral," and cohort Zisha Gelb as well as the primary principal of Kolel, Chaim Shia Babad, with a brush so broad it is impossible to reasonably conclude anything other than the arbitration referenced below was tainted by fraud and corruption and unfairness (the "Motion"). It is for this very reason that based upon the evidence related below at paragraphs 44 et seq, the within Motion should be granted.

**A QUICK REVIEW OF THE PROCEDURAL BACKGROUND DEMONSTRATES THE LACK OF MERIT TO THE SUBSTANTIVE POSITION ADVANCED BY KOLEL IN COURT AND AT THE ARBITRATION; AND, WHICH IS A PRELUDE TO WHY THIS MOTION SEEKING SPECIFIC RELIEF, *INTER ALIA*, THAT THE PRELIMINARY AWARD OF THE ALLEGED "NEUTRAL" AND RABBI GRAUSZ WAS PURELY A RESULT OF TAINT, CORRUPTION AND FRAUD REQUIRES THE AWARD TO BE SET ASIDE[2]**

4. As the Court is aware, in the original action initiated by Kolel it sought a preliminary injunction and *submitted numerous admissions against interest*. There, this Court denied Kolel's motion for a preliminary injunction which sought, *inter alia*, the following relief:

(a) "Enjoining any of the defendants during the pendency of this action from transferring

conveying, selling, pledging, assigning or otherwise encumbering, without the written

---

[1] We must note, again, the parties in each captioned action are not identical, and the relief sought in the two actions are quite disparate. Moreover, one of the actions relates to pre-arbitration denied relief and the second action relates to the conduct of the arbitration and the abuses that occurred during the arbitration itself while naming numerous additional parties.

[2] It seems important in the scheme of things for the Court to have a document that succinctly sets for the procedural background detailing how the parties got to this procedural place in time.

agreement of plaintiff [Kolel], any of the 43 life insurance policies (each a "Policy")

and, collectively, the "Policies"), which Policies **formerly belonged** to plaintiff

[Kolel] and **which were transferred to defendant Wilmington Savings Fund**

**Society FSB ("WSFS") as a securities intermediary for defendant YLL**

**Irrevocable Trust ("YLL") pursuant to an agreement dated March 15, 2011** (the

"Agreement") [Emphasis ours];

(b) Directing WSFS to immediately provide plaintiff with all information in its

possession or control concerning the Policies;

(c) Directing YLL to immediately take all reasonable steps necessary to ensure that each

Policy is held by WSFS as securities intermediary **solely on plaintiff's behalf**

[Emphasis ours; demonstrating an acknowledgement that the Policies were then

owned by Pltfs.];

(d) Directing WSFS to **take all reasonable steps necessary to reflect that the sole**

**owner and beneficiary of each Policy is plaintiff** [Emphasis ours and again

demonstrating an acknowledgement that the Policies were then owned by Pltfs.]; and

(e) Granting such other and further relief as the Court deems just and proper;" [See ECF

No. 3 (emphases supplied)][3]

5. In that initial action in its very own complaint [as well as in the order to show cause they

prepared as referenced above] Kolel admitted ownership of the policies was in the name of YLL.

See paragraph 18 of the complaint (". . .Kolel entered into the Agreement, pursuant to which

Kolel sold the Policies to YLL") (ECF No. 1). After conducting a hearing on Kolel's motion for

injunctive relief, the Court ruled as follows: "After hearing arguments from both sides, having

---

[3]     Although filed by Kolel as ECF No. 3, the docket sheet contains a "Filing Error" notation
and indicates the Order to Show Cause should not have been filed via ECF.

fully reviewed the parties' briefs and supporting papers, and giving due consideration to the arguments raised by both sides, for the reasons set forth on the record at the hearing on this day, Kolel's motion for injunctive relief is DENIED." ECF No. 18. Effectively, affirming ownership of the Policies remains with YLL et al.

6. In that action, with regard to the motion seeking a preliminary injunction, Kolel specifically admitted in its motion papers YLL owned the policies. For example, in its Memorandum of Law, Kolel asserted, "Kolel **sold** a portfolio of 43 life insurance policies . . . to YLL . . . pursuant to a written agreement" (ECF No. 6, p. 1 [emphasis supplied]); "Up and until March 15, 2011, Kolel was the owner and beneficiary of a portfolio of 44 life insurance policies . . ." (ECF No. 6, p. 3 [emphasis supplied]). Clearly, then, Kolel not only was aware of the fact that it did not own the Policies after March 15, 2011; but, at no time in the pleadings or the papers submitted in support of the lost motion for a preliminary injunction did Kolel assert, argue, propose, suggest, intimate or offer that Kolel either owned the Policies, or the sale was contingent upon the occurrence of any event or any performance by Pltfs or that Kolel retained a reversionary interest of any type or nature in and to the Policies. It was then abundantly clear the Policies had been absolutely and irrevocably sold, assigned and transferred to YLL et al.

7. Notwithstanding that ruling and those clear unsolicited admissions by Kolel regarding ownership of the subject policies and non-statements regarding contingency or reversionary interest, each reaffirming ownership being in the YLL et al name, Pltfs agreed to arbitrate any disputes between the parties – as a result of which the parties to the initial action entered into a written agreement to arbitrate which filed with the Court under seal as ECF No. 55 (and which Kolel later filed within ECF No. 64).

4

8. And, indeed, in that written agreement to arbitrate, the parties agreed the Halachic status of the ownership of the Policies did not change by virtue of the agreement to arbitrate; which, in effect, is a continuation of the admission by Kolel that YLL et al., indeed, owned the Policies. Further, reinforcing the ownership of the Policies was in the name of YLL et al., it was provided YLL et al. would transfer the Policies to an escrow account until the resolution of the arbitration; albeit, yet, another acknowledgement by Kolel that YLL et al were the owners of the Policies – after all, Kolel was not transferring the Policies to an escrow account because it could not transfer what it had no legal title or claim to.

9. A second arbitration agreement was entered into which repeated the appointment of 3 arbitrators, to wit, Kolel appointed Rabbi Grausz, Pltfs appointed Rabbi Bergman and the parties appointed one Rabbi Kaufman, who purported to be a "neutral" arbitrator. And, that second arbitration agreement incorporated by reference the initial arbitration agreement thereby ratifying ownership of the Policies was in the name of YLL et al. never stating anything about a conditional sale or a reversionary interest in the name of Kolel.

10. Approximately 7 or 8 sessions of the arbitration occurred, during which counsel for the parties made extensive opening and rebuttal statements. See Manela affidavit at page 3, where he stated: "After the parties had presented, over a period of more than thirty (30) hours, their legal arguments and outlined what witnesses testimony would prove, on April 4, 2012, YLL/Kochav presented their first witness who testified before the Panel" (ECF No. 64, p. 3, ¶ 12 [emphasis supplied]). And, in fact, as the attorney who presented the extensive opening statement and rebuttal, I can state for the record, I continually without doubt asserted at numerous junctures Pltfs would prove through testimony and documentary evidence to be presented and adduced at the hearings on the numerous dates pre-scheduled by the Arbitration

5

Panel, agreed to by the parties and the Panel, which was overseen by the "neutral" arbitrator Rabbi Kaufman, that the absolute and irrevocable sale, assignment and transfer required a finding that the Policies were owned by YLL et al. and that any position advanced or proof to be adduced by Kolel could not affect those unambiguous words of the Agreement.

11. Indeed, it should be noted quite some time was taken at the various sessions in order to create a schedule that worked given the need to consider the schedules of the 3 disparate arbitrators [two of whom had extremely busy calendars], the Halachic advisors for each party and the attorneys for the parties while taking into consideration not only witness availability but the need to conclude every scheduled Friday hearing sessions by mid-afternoon to enable the Sabbath to be observed – it needs to be noted many of the sessions were conducted on Friday as that day in the week seemed to be the easiest to accommodate everyone's diaries.[4]

12. As this Court is now fully aware, after the opening statements and rebuttal statements were completed, the parties had pre-arranged to hear the testimony of Douglas Stein, Esq., an attorney who resides in Atlanta, Georgia, and an attorney and Rabbi by the name of Stephen Friedman, Esq., as the initial witnesses.

13. The parties agreed, and Mr. Chaim Shia Babad, the erstwhile President of the Kolel represented, albeit demanded, the testimony of these individuals would more than likely result in the lack of a need for the testimony of any other individuals.[5]

---

[4]    In addition, it should be noted, members of the Panel and others in attendance had some distance to travel from Brooklyn in order to arrive home in time to honor the Sabbath, which is the reason why the Friday sessions were cut short.

[5]    Actually, it was Mr. Babad, who stated numerous times, if these 2 witnesses told the truth there would be no need for any other testimony. Now, I recognize there is no record of the proceedings as a result of which anyone can say anything and the Court does not have the ability to discern from papers submitted to the Court or to be submitted to the Court, whose version of what occurred is the correct version or the reality. However, if the Court were to conduct a hearing and witnesses were to provide the Court with live testimony the Court could judge the

6

14. One thing is clear and not denied by anyone, namely, Mr. Stein "started" to provide testimony of less than 30 minutes and his testimony was aborted. The parties have different positions as to whether he "fled" or left because he had to catch a plane in order to get home for the Holidays. This diverse opinion is, nonetheless, of no moment.

15. What is abundantly clear and undeniable is the fact the hearing on that fateful day, April 4, 2012, was **scheduled to conclude at 6 p.m.** And, most importantly, on other dates when the sessions were **scheduled to conclude** there was no "overtime" as one Rabbi [Panel member] or another or one attorney or another "fled" the hearing room such that the session was quite timely and promptly concluded. Not a single person on any side or the Panel expressed a complaint at any time about the prompt conclusion of any session. Accordingly, whether Mr. Stein "fled" or simply left to catch an airplane to fly home to Atlanta for the Holidays, is of no import.

16. Even assuming, arguendo, Mr. Stein "fled" the session on that date at 6 p.m., it had been concluded, his testimony had been aborted for the day, there was no reason for him to remain and other hearing dates were already agreed to for him to testify as well as the second witness to testify. Clearly, then, the manifestly self-serving statement that Mr. Stein "fled" is of no import and cannot be used to defend what occurred at the hearing on that fateful day of April 4, 2012.

17. But, what can be maintained is Pltfs were absolutely denied due process by the abject failure to conclude Mr. Stein's testimony that day, as called for by both parties; and, by his not going forward on another date that the Panel and parties had already scheduled.

18. Also, what cannot be refuted, is the Panel simply left the hearing room and sequestered in an ante room at the sua sponte request of solely Rabbi Kaufman at approximately 5:50 p.m.

---

credibility of what is to be testified and who is telling the truth. Nonetheless, the Court may discern, based upon what is being requested in this motion and the papers being submitted herewith, a hearing is not needed to vacate the Award.

during Mr. Stein's aborted testimony and not at the request of any party. There is nothing in the record refuting this action.[6]

19. Details about what occurred after the sua sponte 'neutral' sequestering are of no moment as the parties will recount to this Court as to what transpired differently; and, again, with no record of the proceedings the Court is left to guess as to whose version is correct.

20. It is undisputed, however, that the Panel, by the vote of the "neutral" and Kolel's appointed arbitrator, Rabbi Grausz, without the vote of Rabbi Bergman, rendered the "First Preliminary Decision, Ruling and Award" on April 10, 2012 (the "Award"). A copy of which is annexed for the Court's ready reference as Exhibit A notwithstanding that it can be found within ECF No. 1 at pages 59-60, in 12 CV 3005.

21. Thereafter, clearly displeased with the impromptu and shocking Award, Pltfs considered its alternatives. As a result of that consideration on May 3, 2012 Pltfs caused Kolel to be served with a summons and complaint ["S&C"] requiring it to answer or move by May 24, 2012 (Fed.R.Civ.P. 12[a][1][A][i]; 11 CV 7707, ECF 66). Defendant Rabbi Shlomo Zalman Kaufman ("Dft Kfmn") was served with the S&C through his counsel on April 20, 2012, with an answer due May 5th (12 CV 3005, ECF 9). Each having failed to answer, the complaint's allegations should be deemed admitted. Fed R. Civ. P. 8(b)(6).[7]

---

[6]   As will detailed below at paragraphs 44 et seq, the Court will learn this type of sua sponte action resulting in adverse rulings based upon nothing in the record is the type of conduct Rabbi Kaufman often engages in to the detriment of the party who receives the adverse ruling because of some sort of taint, corruption or fraud – and improper payment.

[7]   Defendant Wilmington Savings Fund Society FSB ["WSFS"] likewise failed to timely answer/move. 12 CV 3005, ECF 8. Even were Kolel and/or Dft Kfmn to secure post-default extensions of time to respond and disputed the material allegations of the pleading, at best the pleadings would establish issues of fact requiring discovery [including depositions and documents demands, etc.]. This Court at footnote 6 of its decision of July 11, 2012 concluded, inter alia, "in light of the fact that Kolel's cross-motion for confirmation of the Award functions, essentially, like an answer, and because the Trust Defendants have not moved for a default

22. As the Court notes at page 5 of the Decision at footnote 5, "[o]n April 12 and 17, the Supreme Court of the State of New York, Rockland County issued orders temporarily enjoining enforcement of the ... Award."

23. In its May 2012 Order, the Court limited Pltfs to a "five-page letter with citations to the record" to support the underlying motion which the Court has denied and in connection with which Pltfs' have moved to reargue and reconsider[8].

24. Accordingly, consistent with Rule 54(b) of the Federal Rules of Civil Procedure and Local Rule 6.3, we hereby submit this Motion to Reargue/Reconsider seeking (i) a reversal of the Decision or, (ii) at a minimum, a stay precluding the confirmation of the Award until a full evidentiary hearing can be conducted on an expedited basis such that the asset in question will

---

judgment, the Court declines, in accord with this Circuit's 'strong preference for resolving disputes on the merits[,] . . .to treat the allegations in the complaint as admitted for the purposes of resolving this dispute. . ..[ citation omitted])." It is respectfully submitted, the failure to submit a proper pleading and simply cross-move by attorney affirmations/affidavits does not address the *specific* allegations of the complaint. While, clearly, the Court in its inherent power can decide no default has occurred, the fact remains, no answer was filed by anyone as required by the Federal Rules of Civil Procedure and the *specific* allegations of the complaint have not been directly responded to, even as this Motion is submitted. We submit the defendant parties should answer the important allegations of the complaint and with those answers the Court will discern even more disputes exist vis-à-vis the appropriateness of the Award.

[8] We do note, the Court stated it imposed this limitation "...in light of the extensive briefing regarding the legitimacy of the arbitration and the multiple exhibits, affidavits and declarations in support thereof which the ...[Pltfs] had submitted to the Court." Perhaps, we can submit to the Court it did not afford the Pltfs the opportunity to submit evidence then in hand of the taint, corruption and fraud then in existence *which was not a part of the record* and which Pltfs have unearthed since then. We submit it is abundantly clear particularly from the affidavits secured since then taint, fraud, corruption, unfairness and partiality clearly existed at the time of the Award. The five page limit imposed upon Pltfs in May 2012 simply did not afford Pltfs an adequate opportunity to seek appropriate due process by making the affidavits in our possession then available (as they were not part of "the record") and those secured thereafter. We are of the firm belief when the Court reads the balance of this Declaration [e.g., paragraphs 44 et seq.] it will be sufficiently concerned such that it will either grant the Motion and overturn the prior ruling or, at a minimum, order an evidentiary hearing to hear the testimony of numerous people uninterested in the outcome of this matter about the corruption and fraud et al involving Rabbi Kaufman, Zisha Gelb and Chaim Shia Babad in their own words.

not be wasted by Kolel to the dramatic financial detriment of the Pltfs, and (iii) depositing into escrow the Policies to be held by WSFS as securities intermediary pending the outcome of this Motion as well as any money received by Kolel with regard to the ownership of the Policies.

## COMMENTARY REGARDING PORTIONS OF THE DECISION WHICH WE SUBMIT SHOULD BE RECONSIDERED BY THIS COURT IN VIEW OF THE EVIDENCE DISCLOSED IN THE BALANCE OF THIS DECLARATION[9]

25. As noted above, the record upon which this Court ruled and reached the Decision did not have the benefit of then available [as noted in the 5 page submission to the Court at that time] and since then additional available significant evidence to consider the claims proffered by the Pltfs.

26. What was solely before the Court earlier did not include any reference to footnote 2 of Pltfs' letter dated June 1, 2012 advising the Court there were "...various nonparty affirmations in our possession" and there was a need for "...a hearing with live testimony from parties and nonparties...", all of which, it is submitted, *would have provided the Court with evidence then not in the record* which would have afforded the Court details concerning the corrupt, etc. nature of Rabbi Kaufman, et al.

27. Had that evidence been submitted at that time, and if that and other newly obtained evidence is considered now, it is respectfully urged the Court would reach a different conclusion.

28. On page 4 of the Decision and at footnote 3 of the Decision, the Court explains the "Panel held seven or eight sessions," while noting both Kolel's counsel Philip Manela and YLL agreed "the majority of those seven or eight days [*not sessions*] ...consisted of 'legal arguments,' or 'opening statements and rebuttals,' by the parties."

---

[9]     Again, most respectfully, for the Court to truly have a full flavor for the basis for this Motion and the evidence which supports the grant of the relief sought, it seems appropriate for some of the more important authority cited in the Decision to be reconsidered in light of the content of paragraphs 44 et seq. hereof. We ask for the Court's indulgence in this brief discussion.

10

29. Notably, at no point did Mr. Manela state "evidence was given both in *testimonial and documentary*" form. This very statement by Rabbi Kaufman in the Award belies the accuracy of the content of the Award when the Decision states, referring to Rabbi Kaufman's Declaration in the same footnote, "evidence was given in both testimonial and documentary form." That simply did not occur. Indeed, in the Award the vague generalized statement neglects to detail or even refer to what "evidence was given in both testimonial and documentary form"; let alone, any reference to any specific documentary evidence at all[10]. The reason for that abject failure is simple – none was given.

30. Indeed, we have already noted and it is unrefuted, albeit agreed to, there was less than 30 minutes of "testimony" from the *first witness* during which time no documentary evidence was submitted. And, if there were "opening statements and rebuttals" there was no documentary evidence submitted.

31. Then, how can the "conclusion" be reached that the Award was made on the basis of evidence given in both "testimonial and documentary form"? This is simply an effort to squeeze a round peg into a square hole for the reasons to be set forth below.

32. We recognize "arbitration panel determinations are generally accorded great deference under the [Federal Arbitration Act]." Page 5 of the Decision. However, as noted at page 2 of the June 1, 2012 five page letter submitted to the Court as Document 73 [a copy of which is attached for the Court's ready reference as Exhibit B], the "FAA at Section 10 **requires** an award to be vacated" where any of the four grounds set forth thereat exist. Here, based upon the discussion below, it is submitted the Court will conclude that these grounds overwhelmingly exist.

---

[10]     Admittedly, the Panel did have the 2 arbitration agreements and the Agreement; but, no other documentary evidence was submitted.

33. Indeed, the Court does note at page 7 of the Decision, "...courts may vacate an arbitration award which 'was procured by corruption, fraud or undue means.'"[11] And, we submit, each of the bases exists here, as detailed in paragraphs 44 et seq.

34. Additionally, we note, as the Court held at page 6 "...as long as there is a barely colorable justification for the outcome reached" the award will be enforced. Here, given the evidence not considered and submitted herewith, we submit **there is no colorable justification for the outcome reached except fraud, taint, corruption, unfairness and simple impartiality**.

35. Then, the Court notes, in the first full grammatical paragraph at page 7 of the Decision, the standard for vacating an award listing 3 items, to wit: "(1) [its] adversary engaged in fraudulent activity; (2) the petitioner could not, in the exercise of due diligence, have discovered the alleged fraud prior to the award; and (3) the alleged fraud materially related to an issue in the arbitration'" [citation omitted].

36. We submit the evidence submitted below clearly establishes, fraudulent activity by the "neutral" and Kolel that Pltfs could not have discovered the activity prior to the Award and the fraud materially related to not only an issue in the arbitration but to the arbitration as a whole.

37. Respectfully, once this test is met, the vacatur is mandated.

38. We note at page 8 of the Decision the Court references cases such as <u>Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.</u>, 668 F.3d 60 (2d Cir. 2012), <u>Morelite Contr. Corp. v. NYC Dist. Council Carpenters Benefits Fund</u>, 748 F.2d 79 (2d Cir. 1984) and <u>Sanford Home for Adults v. Local 6, IFHP</u>, 665 F.Supp. 312 (S.D.N.Y. 1987), and holdings in those cases. We respectfully submit while **proof of actual bias is not required, we**

---

[11] It needs to be noted this phrase is stated in the disjunctive not the conjunctive; meaning any of the three bases would be sufficient to warrant the award being vacated.

12

have it here; **partiality can be inferred from objective facts here**; a reasonable person must conclude **the neutral was partial to Kolel, etc. and "fundamental fairness [was] violated"** (as the Court cited <u>Rai v. Barclays Capital, Inc.</u>, 739 F.Supp.2d 364, 371 (S.D.N.Y. 2010), aff'd 456 F. App'x 8 (2d Cir. 2011) at page 9 of the Decision merely in reference to evidentiary decisions of an arbitrator.

39. Indeed, this is a situation where our most basic notions of morality and justice have been violated.   See page 10 of the Decision, citing <u>Telenor Mobile Comm'cs AS v. Storn LLC</u>, 584 F.3d 396, 411 (2d Cir. 2009).

## THE RATIONALE FOR THE AWARD HAS NO LEGAL UNDERPINNINGS AND IS NOT BASED UPON ANY CASE LAW, HORNBOOK LAW, HALACHIC LAW OR REASONABLE MAN APPROACH – IT IS BASED SOLELY UPON A NEUTRAL ARBITRATOR'S NEED TO SATISFY ONE ADVERSARY GIVEN THE TAINTED RELATIONSHIP THAT WAS CREATED OR EXISTED

40. As was noted over and over and over again at the Arbitration, the Agreement  stated in clear and unambiguous terms  Kolel transferred ownership of the Policies to YLL, and that YLL is the owner of the Policies:

   (a) "WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, all right, title and interest in and to the Policies . . ." [PSA, p. 1 (ECF No. 1, p. 16 of filed document)].

   (b) ". . . Seller hereby *absolutely and irrevocably* sells, assigns, transfers, conveys, and delivers to Purchaser all rights, title and interests of Seller in and to the Policies . . ." [PSA, p. 1, ¶ 1 (emphasis supplied) (ECF No. 1, p. 16 of filed document)].

   (c) ". . . Seller shall cause WSFS Bank to reflect that the sole owner and beneficiary of each Policy is Purchaser . . ." [PSA, p. 3, ¶ 6 (ECF No. 1, p. 18 of filed document)].

13

(d) ". . . Seller shall deliver to Purchaser copies of duly-executed change of ownership forms directing the Insurer of each Policy to change the Policy's owner and beneficiary to Purchaser or its designee . . ." [PSA, p. 5, ¶ 11(b)(iv) (ECF No. 1, p. 20 of filed document)].

(e) ". . . Upon the Closing, *Purchaser will own the Policies free and clear of all Encumbrances.*" [PSA, p. 6, ¶ 12(d) (ECF No. 1, p. 21 of filed document)](emphasis supplied).

(f) "*Seller transfers and assigns to Purchaser all* of its rights, powers, and privileges under the Policies or exercisable in connection therewith or incident to Seller's rights under any surrender or purchase agreement . . ." [PSA, p. 7, ¶ 12(m) (ECF No. 1, p. 22 of filed document)](emphasis supplied).

41. The only conclusion that can be reached from a plain reading of the Agreement is Kolel "*absolutely and irrevocably*" transferred the policies to YLL without condition.   As noted above, Kolel's own pleadings and own court submissions admit this (e.g., ". . .Kolel entered into the Agreement, pursuant to which Kolel sold the Policies to YLL" [Complaint, ECF No. 1, ¶ 18]; "Kolel sold a portfolio of 43 life insurance policies  . . . to YLL . . . pursuant to a written agreement" [Kolel's Memorandum of Law, ECF No. 6, p. 1]; "Up and until March 15, 2011, Kolel was the owner and beneficiary of a portfolio of 44 life insurance policies . . ." [Id., ECF No. 6, p. 3]).  Indeed, there is not a single reference in the Agreement to a "condition" for the sale, transfer, assignment or conveyance; and, there is not a single reference to any reversionary right that remains with Kolel by virtue of the terms and conditions of the Agreement.  Indeed, these very points were repeatedly submitted during the opening statement and rebuttal. And, if was stated, during the hearing and as a result of the testimony, evidence and documents to be

submitted during the Arbitration that these points would be established beyond a reasonable doubt. Further, the Halachic representative of YLL et al. made the same points under Halachic law during the opening statements and rebuttal.

42. Thus, faced with the undeniable and impossibility of contravening the specific language and clear intent of an "*absolute and irrevocable*" transfer with no conditions or reversionary rights, Kolel concocted out of whole cloth a position fully contrary to (i) the simple uncontradicted language of the Agreement, (ii) the facts [to be elicited during testimony and documentary evidence to be submitted in support thereof] , (iii) the law and (iv) this very Court's holding to manufacture  for the 'neutral' some unnatural irrational foundation upon which he could and did reach a tainted, corrupt, fraudulent, partial and unfair Award.

43. Actually, nothing can be submitted by Kolel to refute its own admissions in documents submitted to this Court re ownership, the Agreement, etc. – thus, the sine qua non is they needed to find a backdoor modus vivendi to obtain an award that was tainted, corrupt, fraudulent, partial and unfair.  The facts below, we submit most respectfully, demonstrate Kolel located the correct 'neutral' and his cohort which in tandem with Kolel arranged for the tainted Award.

**THIRD PARTY STATEMENTS REQUIRE A CONCLUSION THE AWARD WAS PROCURED THROUGH FRAUD, CORRUPTION, UNDUE INFLUENCE, WAS UNFAIR AND TAINTED, WARRANTING  VACATUR; OR, IN THE ALTERNATIVE, A STAY, PENDING A FULL EVIDENTIARY HEARING CONDUCTED BY THE COURT TO PRECLUDE THE ASSET FROM DISSIPATING OR BEING DESTROYED BY KOLEL WHICH DOES NOT OWN IT AND GRANTING YLL ET AL. THE RELIEF SET FORTH IN THIS MOTION**

44. Pltfs have been very busy attempting to determine if they could unearth evidence that might be found to require a conclusion to be reached that Rabbi Kaufman, Zisha Gelb and Chaim Shia Babad worked together to create the illusion of a fair arbitration to be conducted by a neutral who rendered an unfair, tainted, corrupt and fraudulent Award in favor of Kolel.

45. To that end, it, initially, seemed a very difficult task, as the people who ultimately did step forward, advised there were "intimidated," "scared," "in fear of their life," "had been coerced in other matters involving the neutral," "had been held captive by the neutral so as to give up in a matter," "had been threatened with guns and phony badges," etc. precluding them from obtaining an untainted, non-corrupt, fair and non-fraudulent decision in a Beth Din – including the arbitration which is the subject of this Motion.

46. Moreover, it seems, we have been advised, people are fully and completely outraged at the manner in which Rabbi Kaufman and Zisha Gelb, who worked in concert with Mr. Babad, conduct themselves in order to obtain a pre-ordained result in the subject arbitration as well as a myriad of others thereby defeating the very concept of "fundamental fairness."

47. In evidentiary support of the foregoing, we submit some of the affirmations/affidavits/declarations we are in possession of[12] state in sum or substance, "…I fear repercussions from …the 'neutral arbitrator' and the plaintiff Kolel Beth Yechiel Michel of Tartikov…", or "..I was held in captivity and tormented physically and emotionally, . . . by Kaufman," etc.

48. Notably, the detailed atrocities the triumvirate has engaged in did not stop these people from wanting to disclose the truth once they learned there was strength in their number and discerned the truth needed to be brought out to the Court.

---

[12] The declarants/affiants who voluntarily decry and were the victims of the outrageous unfair prejudicial conduct of Rabbi Kaufman, Zisha Gelb, et al. have asked that their affirmations/affidavits/statements be reviewed *in camera* as they live in fear of severe repercussions from the triumvirate who secured the unfair Award if their identities were disclosed at this juncture. They believe they would be more protected if they were to testify in Court without their names being disclosed before a hearing as they could/would not be intimidated or suffer repercussions before such testimony would be given. Indeed, one of the people voluntarily appeared for a quick deposition of sorts and stated he feared for his life and was threatened with guns and phony badges and temporarily was constrained to flee to the State of Israel to escape the repercussions he feared.

49. Accordingly, given the fears expressed by the affiants/declarants their names will be not be disclosed at this time, but can be disclosed to the Court *in camera*, if the Court desires same; as noted, irrespective of the fears and potential for reprisals, the declarants/affiants believe they would receive more protection if they testified before the Court at an appropriate time as they believe the power of the Court at that time would override any possible repercussions, intimidation, threats, etc. after a hearing.

50. Based upon the foregoing and without referencing the specific details of each declarant's horrendous experiences in order to attempt to protect their identities, below please find the essence of the statements we are in possession of, which we submit affords the Court ample detail to discern the type of unlawful conduct engaged in which resulted in the tainted Award being rendered unfairly.

51. Declarant A states he was personally involved with a matter with the neutral Rabbi Kaufman. Mr. Zisha Gelb with Rabbi Kaufman "...perpetrated a **fraudulent and horrendous scheme**...." Said declarant states he has personal knowledge that a "...**huge sum of money was paid to Gelb...which was also used to bribe and split with Kaufman to reach a favorable outcome**...." Said declarant knows that the person involved in the arbitration was driven "...by Gelb to Kaufman's office in Monsey,...led to a tiny backroom with room to sit for a person, ...[a] cell phone was [taken] from [the person], [the person] was not allowed to any communication during the that time...." Said declarant states further the person was "...then **coerced** into partaking with the religious divorce..." '...against said person's wishes, but as a **result of the fear and coercion exercised by Gelb/Kaufman** [e.g., the person "...was not allowed [to read papers but was forced to sign the papers]" and didn't "...know[ing] what ...[was] signed..., [and] was not even given a copy of the papers....". Indeed, "[a]t the time, [it

was unknown] Gelb was a close ally of Kaufman and that **they work together as a team to help the party who hires them to win favorable judgment, while Gelb collects the funds, he gets Kaufman to act as the supposed "Neutral Rabbi" or arbitrator, we simply could not have believed at the time that a Rabbi like Kaufman was involved in corruption, it later became very obvious that while Gelb was making the decisions, Kaufman was executing them on his behalf.**" [Emphasis supplied.]

52. Declarant B states, inter alia, "…[_____] has been conducting investigations within the community in recent months, on numerous cases that Rabbi Shlomo Zalman Kaufman presided as an arbitrator where **improprieties and dishonesty played a large role,**" "…initially [it was] chosen not to publicly proclaim against Rabbi Kaufman, as he was **given ample warning, not to arbitrate any further,**" '[w]ithin the last week, of July 9th, **12 leading Rabbis…, have declared the arbitration proceedings of Rabbi Kaufman null and void…where Rabbi Kaufman…blatantly violated against [sic] Halachic and civil rules…**." [Emphases supplied.]

53. Declarant C states "[i]t is known to me, and I understand that it is already common knowledge within the Orthodox Jewish community in Monsey, New York, that a certain Rabbi Shlomo Kaufman…, is a **corrupt individual that passed himself off within that community as a rabbinic judge, while working together with a certain Zisha Gelb…, whose function was to recruit cases to Kaufman, and where decisions were made in favor of the highest bidder, and where the bids were likewise solicited directly by Gelb…**." [Emphasis supplied.]

54. Significantly, and only in part, Declarant D says, "I possess facts directly relating to the ***instant matter*** that reflect **gross corruption entangled with bribery on the part of the neutral arbitrator and the plaintiff Kollel Beth Yechiel Michel of Tartikov**." "**Gelb** had …**told me**

18

…that **he and Kaufman work together in their Beth Din business as one body, and that Kaufman and he often confer together, and that Kaufman relies wholly on his opinions and adheres to them**." "Gelb told me that **he received …check from Chaim Shia Babad and that he was retained by him for the above captioned matter [this case]**. And I **knew first hand that Gelb was working for Chaim Shia Babad** …." Also, "…Gelb assured me that he was going to be receiving …_**much larger sum from Chaim Shia Babad as soon as Kaufman renders his favorable decision for Kolel/Babad**_…." Said declarant states **Gelb boasted "…he and Kaufman work the Beth Din rulings together, adding that he (Gelb) controls the Beth Din outcome, and that Kaufman does nearly all the time what he says; and that nearly every case he recruits to Kaufman is a guaranteed win**…." Also, **Gelb boasted "… over the power he controls,…."**; and, the money he would be getting to assure **"Kollel Tartikov a full victory by Kaufman."** Emphasis supplied; this demonstrates direct knowledge of corruption, fraud, unfairness, partiality, etc. with regard to the subject arbitration.

55. Declarant E states he was "…held in captivity and **tormented** physically and emotionally, without receiving any food by **Kaufman and his goons** for a total of eleven hours". He was told "…my ability to leave is subject to my giving a full unconditional divorce, unconditional upon any custody, visitation, child support and all other issues…", "…my failure to adhere to their demands, would subject me to physical beatings and torture…." He states further he was threatened that there were **"2 additional muscular bully's … coming to 'convince me' to comply with the demands."** As if that were not enough, at another juncture, **"…an agent of S.Z. Kaufman…[said] I will not be leaving alive in one piece if I don't comply with the demands of Kaufman and his group….**" Said declarant states he was "…handcuffed, blindfolded and violently beaten…" by these men. Indeed, he was even

19

"...shoved into the backseat of [a]...care, ...told [he]... was being taken to upstate NY where [his]...body won't be found." [Emphases supplied.]

56. Declarant F states in a Beth Din where the person was involved, Rabbi **Kaufman, "already had the answer in [his]...hands ..." in the Beth Din before it was even conducted.** [Emphasis supplied.]

57. Declarant G states, his adversary in a Beth Din knew the results of the Beth Din before a ruling was issued because of **ex parte communications with Rabbi Kaufman** without him being present and that **Rabbi Kaufman lied** continually about the outcome of the Beth Din to this declarant.   At a separate mediation between said declarant and his adversary, the adversary admitted the ex parte conversation took place.   And, "[r]ecently within the last 2 – 3 months several leading Rabbis including a prominent Rabbi.....issued a declaration ....that the arbitration is invalid." [Emphasis supplied.]

58. Then, most interestingly, a sum of money was loaned to another person to assist him in a difficult and desperate situation.   The two declarants describe the situation and conclude that "...**Chaim Babad**...would pay me what was owed...**if I could convince [another person] to work with...[Kolel] against...[YLL et al]...and convince [this other person] to sign documents supporting ...[Kolel's] position in order that the [other person]... could avoid....[being damaged by the loan].**..."   The other person confirms he was "approached" by the first declarant who "...**indicated that Chaim Babad had offered to pay off the debt I owed if [the first declarant]...could convince me to support [Kolel]...against [YLL et al]....**"   Emphasis supplied; additional direct evidence of the lengths to which Kolel was going to obtain an unfair result in the arbitration effectively confirming the affirmation submitted to the Court by Mr. Paneth.

59. An additional declarant, an esteemed Rabbi, states after a lengthy and thorough examination he and community leaders have come to a conclusion regarding Rabbi Kaufman's dealings of cases – which cases are "…**filled with ex parte communications, corruption, improprieties and scandalous behavior [which] have surfaced and were brought to my attention**." After probing the allegations, in the "dozens of cases" that came to his attention, he "…**sadly found those allegations to be unfortunately factually true**." Given the "sensitivity of some of the cases," especially "with the intimidation and for the safety of the affected parties in these cases," the esteemed Rabbi asks that his declaration be "submitted to the Court *in camera*." And, he does go on to state there are **"[m]any more cases with astonishing factual improprieties are still unfolding and being examined"** with decisions having been **"…decried and/or nullified…by the Rabbinate of the State of Israel and …the Chief Rabbi of the Orthodox Union."** Emphases supplied.

60. Then we have the testimony of another person who was forced to sign an affidavit under physical coercion and fear for his life in the backseat of a car – which affidavit rebutted the first affidavit he provided to us and which second coerced affidavit was refuted by his third affidavit. All three affidavits are already referred to in prior papers submitted to this Court. However, notably, the first and third were filed; the second – the so-called recanting affirmation -- was not filed. And, what is not before this Court is the methodology by which the recanting in the second affidavit which the Court refers to in the Decision was obtained. It seems rather significant that the person was coerced at gun point and forced to sign the recanting affidavit – after the Award, but in an effort to cover up the fallacious nature of the Award and the lengths to which the triumvirate had gone to secure the Award. Moreover, this person is prepared to and has already given sworn testimony that Mr. Babad's niece tried to trick or coerce him into giving

21

false statements and affidavits to support the Kolel's position – and even followed him to Israel where he attempted to flee for fear of his life from Mr. Gelb and the hoodlums who threatened his life forcing him to sign the second affidavit in the backseat of a car against his will. This is further evidence of the corrupt, etc., nature of the triumvirate vis-à-vis this specific Arbitration.

61. We are in possession of other statements from yet additional declarants all outraged at the conduct of the 'neutral' and Gelb which give further credence to the activities which took place here.

62. Clearly, what seems to exist here is a way of life by which arbitrations are conducted through threats, intimidation, payoffs, corruption and basic unfairness. This Arbitration is just one of many that follow that pattern.

63. Thus, it is respectfully urged the tests cited in the case law set forth above and in the Decision which enable this Court to vacate the Award have been more than amply satisfied; and, in the alternative, if not satisfied, at the very least place a dark ominous cloud shrouding the Award in taint, corruption, fraud and unfairness such that the sensibilities of the reasonable man must be shocked.

64. At the very least, if the vacatur is not granted on the basis of these papers in support of this Motion and the declarations referenced above, we respectfully submit the Court should order a full evidentiary hearing such that it can hear the testimony which decries the conduct of neutral Rabbi Kaufman and his cohort in corruption Mr. Gelb along with Mr. Babad which resulted in the wrongfully and illegally obtained Award. A full inquiry into the conduct of this triumvirate is appropriate. And the relief sought in paragraph 22 of this Declaration should be granted.

65. To the foregoing end, in the interim, it is respectfully requested that the Court issue a stay precluding Kolel and/or any third party from taking any steps or engaging in any conduct that

would adversely affect the subject policies and that if there has been any policy that has matured any proceeds from that policy be placed in an escrow account with the Court to prevent the funds from being improperly used. Moreover, if there has been any sale or assignment of the policies that the third party who acquired such policies be put on notice of this application and that such third party be stayed from engaging in any conduct detrimental or adverse to YLL et al.'s interests in the policies.

66. The improprieties referenced hereinabove are extremely far-reaching and affected the lives of many many people in an adverse manner. But for the Pltfs efforts in this case none of these matters could have come to the fore and the triumvirate would/could/might continue conducting themselves in a manner that is detrimental to the well-being of the Community not to mention the hundreds of millions of dollars at stake in this matter.

WHEREFORE, it is respectfully requested that the Court grant reargument and reconsideration and vacate the Decision confirming the Award and vacate the Award itself, together with the relief requested in paragraph 22 hereof; alternatively, it is requested the Court convene an evidentiary hearing on the issues set forth herein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:     New York, New York
              July 25, 2012

_____
STEPHEN R. STERN